and we'll give the, give the courtroom a chance to change around and get settled before we get started. I guess we don't have to change it around too much since we have the same counsel for the government here. Thank you. May it please the court. I'm prepared to speak on any issue the court wants to talk about, but left to my own devices, I'm going to focus on the property in Kastgar issue. Did you keep your voice up? My apologies, Your Honor. As I've left to my own devices, I'll focus on property in Kastgar. Surprisingly, the government and I agree on the key points that beside this appeal. First, the property fraud statutes reach only schemes targeting a traditional property interest in the victim's hands. Second, the only property interest the government identified at trial is the city's purported interest in money from a hypothetical future sale of JPMorgan. Yeah, but the problem with your theory that I understand is that you could never charge for an attempt. If you were right, that the property actually had to have already been stolen and be in the hands of or defrauded that the defendant would have had to have defrauded the victim already in order to charge it. And that's just not the law. The law allows for attempts or failures. And here, as I understand it, the alleged property is the money that JEA would have brought in for its sale to the city of Jacksonville had this gone through, except that the city wouldn't have received a large chunk of that money because instead it would have gone to the defendants through the PUP. That's how I understand it. But maybe I'm missing something. Yeah, I don't think there's any water between us, either your question and our position or us and the government on this. The question is not whether this money that might have existed at some point in the future, like, was going to exist or not. Like, the point is, did the city have a legal right to its payment? That is the question that is dispositive of the property inquiry. So your argument is that the scheme didn't target property hinges on your argument that the city may not have received money from the sale of the JEA? That the city was not legally entitled to the receipt of proceeds over $3.4 billion. Maybe you can clear this up for me. But there was evidence that the JEA was the city's biggest and most important asset, which the city could decide to sell in its entirety or in parts. So I guess I'm just struggling with the basis for your argument that the city was not legally entitled to the proceeds of any sale. Okay, two points on that. First, the city was not entitled to sell JEA. As a matter of charter, this was evidence in the record, but the charter's also been cited all over in the briefs, was adopted by special law in 1967. The legislature stripped the city of Jacksonville of ownership of its utility assets and vested them in JEA, which owns its own assets. That's what the evidence shows. The government agrees with that. Under the charter, JEA had the right to sell its own assets. The only limitation on that right is in a sale of 10% or more of its assets. It had to get approval from the city council and the voters of Jacksonville in a referendum election. The city council would come first, and they have to present it to the public for a vote. That's correct, Your Honor. That goes to the underlying point, I think, which is you strip – I think Your Honor referred to testimony that JEA was the city's biggest asset, right? You have a lot of that. That's like the popular misconception that a local government owns a local utility. Who owns JEA, then, in your view of things? JEA owns its assets. I think ownership of – like, had a sale happened and there was a big pile of money, I think the ownership is unclear and likely divided. I mean, I would say the state of Florida owns it, because the state of Florida under our Constitution exercises plenary authority over municipalities. It created Jacksonville Electric Authority by virtue of its creation. So your argument is that if anyone would have been defrauded, it would have been the state of Florida? I think that's correct. But, I mean, I don't think that's the argument we have to make. It was the government's obligation under Simonelli and Kelly and Cleveland to prove a traditional property interest in the victim's hands. The case it indicted and the case it tried were that the pup would have taken millions of dollars from the city of Jacksonville general fund. So it had to prove that the city of Jacksonville had a legal entitlement to that money. Its response brief – and let's just kind of be clear about what the government concedes here, because it's really important to this ownership question. The government concedes that JEA owns all of its own assets. Okay? So the idea that the city had a property interest or an ownership interest in the assets is off the table. The government concedes, conceded at trial, and that was its evidence too, that there's no equity in JEA for the city to have owned. My understanding is what the city would have gotten, if anything at all, would depend on the contract for the sale of JEA, which the city council approved and the public referendum approved. That is true. Which might be zero. Absolutely correct. Whatever the negotiation was. Absolutely correct. And in the negotiation, I suppose, the city would say, we're not going to approve unless we get a little bit of money. That's exactly correct. But there was – and that goes to my point, though, right? Once you eliminate assets and equity, the traditional indicia of ownership – Well, I understand that. Okay. Okay. Yeah, but to your point, Judge Toflat, the government had no evidence. There was no signed contract. The draft contract that was admitted into evidence – They had a possibility. They had a mere expectancy or a possibility, which traditional property law has never recognized as a form of property. I think we've cited those cases in the reply brief, and like mere expectancies just aren't property. They're a nice thing to get if they come into existence, but you have no legal right to demand them. So let me ask you a question. Didn't JEA's own materials describe it as a municipally community-owned public utility? I am sure that you will find that reference in several documents.  That is kind of – Did the Jacksonville Charter create JEA as an independent authority with plenary authority over the utility systems? Technically speaking, the Florida legislature did. That Article 21 of the city's charter first came into existence by virtue of the Special Act in 1967 at the same time. But it's a part of the Jacksonville Charter. They placed it in Jacksonville Charter pursuant to the legislature's constitutional authority to amend city charters. So why then does the inability of Jacksonville unilaterally to sell JEA necessarily negate a municipal property interest in it? Well, I think the point is the government contends that the city's property interest is ownership, right? At common law, as traditionally understood, ownership is the totality of rights, powers, and privileges with respect to a thing. Absolute dominion, including at a minimum, the authority to possess, to use, and to dispose. This record establishes none of those things. All this record establishes – and look at the evidence the government relies on. It is evidence that we got to appoint – the city got to appoint board members. The city got to do audits. The city had a right to an annual contribution in lieu of taxes. The city could, you know, approve a sale of 10% or more of the assets. Those are all indicia of regulatory authority. They are no different than the regulatory authority the Supreme Court was talking about in Cleveland. So where are you saying that – let's say that a sale had gone through and the POP wasn't in place. Where are you saying the proceeds of that sale would have gone to? Well, first of all, the sale would have had to have generated more than $3 billion, $3.4 billion. Okay, let's assume that that happened. You would have had to imagine proceeds above that. I don't doubt for a minute that the city believed that it would have received that money. I don't – like you can see that expectation in the documents. So where are you saying the money would have gone? I think there would have been a discussion with the Florida legislature. I think that this was a state-created entity and that the legislature has supreme plenary – yes. What happened was the Florida Constitution had a strange provision put in there in the 30s which allowed everybody within Duval County to wipe the county free of any government. All that was left was the sheriff. There was nothing. So the consolidated government of the city of Jacksonville is a brand spanking new creation. They got rid of – the electric authority was a cash cow for the old city. All that went out the window. They created a new agency. That's correct. That was it. That's correct. Approved by the legislature and subject to referendum. That's correct. And that actually leads to one other point I want to make. When it comes to evidence of ownership at this trial, the government didn't even admit Article 21 of the city's charter into evidence. If ever you were going to look for proof of ownership as property traditionally understands it, if it is what the government claims, it would be in the charter.  What's that? I think that 21 says everything at all about ownership. The JEA owns its own assets. Of the charter, paragraph 20, section 21. That's correct. It establishes ownership in JEA. And everything they can do with it. And everything they can do with it, including disposal. And what they can't do with it. That is correct, Your Honor. So I have a question about Castigar, and I want you to sit down before I ask my question. I'm glad for the opportunity. I thought you might be. So you argue that a Castigar error is structural error, not a trial error. But the Supreme Court in Arizona v. Fulminante held that using a defendant's involuntary confession was a trial error, not a structural error. So how would you distinguish a Castigar violation from the involuntary confession in Fulminante? The way I would distinguish it is the unique nature of what's going on in Castigar. And then the nature of the error arising at trial under the Fifth Amendment versus arising at the grand jury under the Fifth Amendment. The error in . . . So I don't think you're really addressing . . . So you're saying there is a difference. A Castigar compelled testimony is different from an involuntary confession. But can you talk to me a little bit about that distinction?  Because what Castigar says is that the immunity that the defendant gets for being compelled to testify has got to be coextensive with his Fifth Amendment privilege. So if you have any circumstance in which that information is used, directly or indirectly, to obtain an indictment, you've got a Fifth Amendment violation. At trial, you might say that an admission of some part of immunized testimony was harmless because it is both discrete and it is judicially mediated. It is discrete in the sense that it's one piece of testimony, judicially mediated in the sense that you get a ruling. The appellate court can say, yeah, that ruling was right or wrong and see how the flow-through of that discrete piece of evidence would have affected the outcome of the trial. You can't do the same thing in the context of the government's procurement of the indictment before the grand jury. There's no judicial supervision of those proceedings. You have no way to tell is there a tiny piece of evidence that would have shook the thing one way or another. All you can do in the Castigar context is ask the question that the merits part of the standard asks, which is does the government have a wholly independent source for all of this in the indictment? I would say, although we believe that Castigar error ought to be treated as structural error, I don't think you have to reach that problem here because what is clear is that there's a reasonable possibility that the tainted evidence gave rise to the indictment or at least that the government never gave the district court the record necessary to make that determination. Your argument to that is that I think it was an eight-day hearing that the district court conducted on the Castigar issue? That's correct. Your argument is the government did not bring all the grand jury witnesses. They only brought half. There were 25 witnesses before the grand jury with respect to 13 of them. They weren't presented at the Castigar hearing. We have no idea how they were tainted, what the extent of their taint was. The district court was just not able to evaluate that because the government failed to give it the record that it needed to get there. In a universe where dissemination of Mr. Zahn's Garrity Statement was crazy widespread, something like 14,000 independent disseminations of it all over the press, and that failure is on the government. They knew what the standard was, wholly independent source for the entire indictment. It was incumbent on them to produce that record. As a remedy, you're not telling us, okay, the district court got its analysis wrong, send it back to the district court for a redo. You're arguing that the Fifth Amendment would preclude this prosecution in toto. The Fifth Amendment would require dismissal of this indictment. I don't think we express a view on whether the government could re-prosecute, nor do we need to. All right. Thank you very much. You've reserved four minutes for rebuttal. We'll hear next from Ms. Chang. Thank you, Your Honor. Good morning. May it please the court. Emily Chang on behalf of the United States. I'll start with the property question. Mr. Zahn contends that the question is whether the city had a legal right to the proceeds of JEA. That's not the question before this court. The question before this court is did the jury have sufficient evidence to find that the city had a traditional property interest and that that was the subject of Zahn's fraud. And it was. Money is a traditional property interest. And Zahn's entire goal in this scheme was to get the pile of hundreds of millions of dollars from the PUP. Counselor, it was all speculative. It was not speculative. A lot of things had to happen before the city got a nickel. But all of those things were part of his scheme. And the question. You agree that that's so. It's sort of a hypothetical. There had to be a structured agreement produced to the city council. You'd have to know what's in the agreement. The city council would have to approve it. That would go to the public in a referendum. Absolutely, Your Honor. Before the city would get a nickel. That is true. And what is charged is that Mr. Zahn designed a scheme. So what I'm saying is whether those things would have happened is pure chance, is it not? No, it's not pure chance. Do you think it's probable? I think it's very probable, Your Honor. Okay. You think that what would have happened is probable? Yes, Your Honor. And I believe it's probable. Why is it probable? Because Mr. Is it probable that the public would have approved of the transaction? Absolutely. Because of all of the things that Mr. Zahn baked into this deal. There was $3 billion for the city. There's $350 for every single utility. Wait a minute. Yes. We have to get it approved first. Yes, and that's exactly what Zahn did by lying to the board, by lying to the public. You're talking about if we go back in time, if that had happened. You're required to go back in time. No, Your Honor. Mr. Zahn designed a scheme. You've got to go back in time to when the city approves a transaction. Was there a transaction proposed as to which JEA agreed? So before any transaction could be proposed to the city, there were hurdles that had to be passed. That is exactly what Mr. Zahn's scheme was designed to put all of those stepping stones in place in order to get to the place where the city would approve a transaction. And that's exactly what Mr. Zahn did. In order to even get to the transaction, he had to get the board's approval to pursue Scenario 3. In order to do that, he had to convince the board, Oh, no, JEA's in trouble, which it's never been in trouble before. But he convinced them that that was so. Not only that, he had to convince the board, Well, we need this long-term incentive plan to bring our pay competitive to the 50th percentile in the market. All of those things were part of an elaborate scheme so that Mr. Zahn could get a transaction before the city. And yes, it is probable that the city would have voted for it. City Council, which city councilman is going to say, No, I don't want $3 billion for the city. And which voters are going to say, I don't want a $1,400 rebate from JEA just for voting for this referendum. So let me ask you a question. Actually, I have two questions. Yes, Your Honor. The first question is, what is the evidence, in a nutshell, that Jacksonville, the city of Jacksonville, was going to receive money from this sale if it went through? Yes, Your Honor. In the absence of the POP, right? Yes, Your Honor. You know what I'm saying? Yes. And the second question that I have is a legal question, which is, even assuming that there's sufficient evidence in the record, which I think there probably is, if it were a legal impossibility that the city would actually receive the money and instead the state would receive the money, do you have a problem? Because it seems like you would. So if I may take the first question first, there's abundant direct evidence that the city would get the money from the sale. We have the PFM report from 2018. PFM is this entity that's been doing financial analysis for the city for many, many years. They talk about how the net proceeds of a sale of JEA go to the city, and that the city gets to choose to sell JEA's assets. This is a quote. Some factors that would drive JEA's value would, quote, be in control of the city as the seller. Not only that, the COO of JEA, Melissa Dykes, testifies that if, for example, private placement were the option that were picked in Scenario 3, the city would get a big equity check. Moreover, she also talks about giving the city, quote, whatever it would need for a sale price. She says, quote, net proceeds to the city would have been $6.452 billion with a NextEra bid. She talks about how equity capital can be used to, quote, purchase the utility from the city of Jacksonville. She also says that the city can retain ownership of the utility, and then later on she says, or it would revert back to the city at the end of a concession agreement. All of those are direct evidence that the city is the seller and the city is going to get the money. And it's not – we disagree with Mr. Zahn's characterization that the money would have gone to the state of Florida. And, in fact, the city – the charter shows that the city exerts a lot of control, most of the control, over JEA. Not only can JEA not sell more than 10 percent of its assets without permission, it can't borrow a nickel without permission of the city. And, moreover, the city can – I'm sorry, city council can appropriate some of – any of JEA's revenues that it wants for the city's purposes. That is the epitome of ownership, when I can dig in and say, well, I'm going to take your profits and use it for myself. So all of that's in the charter. All of that's in Zahn's Exhibit 134, I believe. As for your question about the legal impossibility, the government – we don't think you need to reach that question because it's not a legal impossibility. But to answer your theoretical question, that would be a problem. But the evidence here is not – that question doesn't get posed here. Yes, Your Honor. How does this differ from a situation, a hypothetical situation, in which you have a publicly held corporation, and some of the management decides, here's what we're going to do. We're going to have a merger. We're going to have this or that or the other. Okay. And as it turns out, somebody says that, but that's a fraud. That's going to be a fraud on the corporation. Are all those indictable just like this? How do you distinguish? Between this case? I want to take this case and put it in the private sector where you have a corporation, a public corporation, okay, and you have some members of the leadership of the company dream up a transaction for the future. They're going to get well out of it, say, out of the future. But it doesn't come to fruition. Are they subject to indictment because they had the idea to do that? They're subject – Then why not? Okay, sure. So there are two statutes at issue here, so I'll take them one at a time. So Section 666 requires, for example – Let's take that out. Okay, sure. We're talking about a hypothetical case – Yes. In which some insiders and management and a corporation dream up what they're going to do with IBM. They're going to merge it with General Motors or whatever it is, and out of it they're going to get some money. Okay? Yep. But it doesn't – that's the end of it. Are they subject to indictment on the conspiracy? Well, the conspiracy is – Yeah, the conspiracy to take money from IBM. Well, it would have to be conspiracy to do what? So here, it depends. Is there a conspiracy? Is there a scheme to defraud of property? Yes. The answer is yes, because they're trying to get money. And then the question is, did they cause a wire for the purpose of executing that scheme and artifice to defraud? So the question is whether or not there would be sufficient evidence – Well, first you'd have to have some material false statements or material omissions, like you presented here, in the scheme where there was the first and second scenario that turned out not to be accurate. And in addition with the PUP that was represented to be $3 million to $4 million in cost, when actually – when Zahn intended and he told Melissa Dykes this, I want the sale to trigger the PUP. I want them both to be passed on the same day so that one will trigger the other. What I'm not telling you is that that means I get a couple hundred million dollars. Let me ask you a question about the constructive amendment of the indictment, which is, as you might recall, the indictment alleged that Zahn was an agent of JEA within the meaning of 18 U.S.C. 666-D1. But it didn't expressly allege that he was an agent of the city. But the jury instructions instructed the jury that the first section 666 element was satisfied if Mr. Zahn was an agent of the city of Jacksonville or JEA. It seems like that was a constructive amendment of the indictment. And my concern goes to not the notice – I think there was notice. That's not – doesn't seem like it's a problem. But, I mean, how can we be sure that the grand jury understood what it was indicting with respect to that, given what seems to be a change from the indictment to the jury instructions? So under this court's jurisprudence, in reviewing a constructive amendment, we may have to review the indictment as a whole. And the indictment as a whole, fairly read, alleges that Zahn is an agent of the city. I mean, it says that JEA is a publicly owned utility, owned by the city, and that it's a city agency. So as such, JEA is stewarding the utility services for the city. It's responsible for this huge mass of assets that provides one of the city's most important functions. As such, as the head of JEA, the grand jury is naturally going to understand, using its common sense, that Zahn is also an agent of the city. If you're the head – I'm not saying the janitor in JEA is an agent of the city. I'm saying the head, the CEO of – But even so, I hear what you're saying, but that he was an agent of either JEA or the city is an element of the 666 offense. And so, I mean, because it was charged only as an agent of JEA, that seems a little bit more troubling than, for example, if you had a constructive indictment in some other respect. Well, so unlike the cases that are cited like Keller, Madden, Narag, in those cases, the indictment is phrased in a way that limits the scope of the indictment. So for example, in Keller, the indictment alleged that the defendant conspired specifically with this guy named Smith to rob a bank. And then the jury instruction said, well, you can find that the defendant conspired with anyone. Well, that's not what we have here, though. Yes, the indictment says that Zahn was an agent of JEA, but it doesn't say he was an agent only of JEA. Not only that, the indictment as a whole, fairly read, shows he has a fiduciary duty to the city. He is scheming to obtain money from the city. The city owns the property that is the object of his fraud. Reading it all in combination, the indictment naturally leads a grand jury to understand that Zahn is also an agent of the city. There's nothing else that he could be as the head of JEA. He has to be also the head of the city. I want to make sure I address the Castigar issue that Judge Branch raised. How can you be both an agent, a fiduciary of JEA, and at the same time of the city? How does that work? You've got two masters. In a lot of places, we have two. Two masters. Sure. In conflict. I don't think they're in conflict at all because they're not. I just want to know whether that makes common sense. No, it does make common sense because the city owns JEA. When I'm a steward of the smaller thing— The city doesn't own JEA. The city—there is a wealth of direct evidence in the trial, in the record. I read the charter 100 times. The whole works, including 21. The city owns nothing with JEA. Actually, the charter says— That's why the consolidated government was created, was to get JEA out of the city. Wasn't it? Isn't that so? No, the utility function was given— Is that not why it was done? It was done— Not before consolidation was not the JEA a cash cow for the city, which it bled dry. I don't know about that because it's— You should know. It's part of the legislative history. Well, Your Honor— So they wiped—Duvall County wiped all government clean out of the county and created a new city, and they took JEA out. But not fully out because the city still—  But that's important, Your Honor. I speak for myself. My reading of the charter, the provision established in JEA, I don't see how the city owns it. The city—the charter gives the city—sorry. Because that would put it back where it was to begin with. No. The last thing the people or the legislature or anybody wanted was the city to own JEA. That is the very last thing they wanted to happen. I respectfully disagree that that's— Won't you agree with that? I do not agree with that, Your Honor. I do not agree. I believe that the charter gives, and the charter says it gives, JEA all of the rights that the city otherwise would have, and it retains— What would have been the difference— If the city owned JEA, what would have been the difference between that and the pre-charter situation where they owned it? JEA is allowed to make a lot of independent— No, no, no, no. Before consolidation, the city owned JEA. Yes. You're saying afterwards it still owned JEA. It still owns JEA. JEA exercises a lot of independent power with respect to the utility services. That's its function so that it doesn't have to constantly go back to the city to get permission every time it wants to sign a contract. That's why it's an independent agency. At the same time—and I see my time is up, but— It's okay. You can finish your answer to the question. Okay. Thank you. So, JEA still just retains its power to supervise the utilities, but it's doing that all on behalf of the city, as demonstrated by the fact that the charter retains in city council so much control over JEA's finances. And I know you wanted me to address the Castigar issue. Let me ask you a question about that. Suppose the prosecutor in a case like this, the Castigar problem case, is privy to all of the immunized testimony, the prosecutor is. And, of course, now he's putting on witnesses. When he interviews the witnesses to put them on, and when he cross-examines people, he has all the immunized testimony in his mind. Is there a Castigar violation there? There would be a Castigar violation if his knowledge of the immunized statements shaped his— Hold still. The prosecutor knows all of the immunized testimony. Yes. In fact, he knows the most critical part of the immunized testimony. And now, Dossler does not violate Castigar that he prepares the case, interviews the witnesses, cross-examines using that information. Yes, that would be a violation, and that's not what we have here. That is not what we have here. Your argument is that Mr. Duva didn't know anything at all about the immunized testimony. Our testimony is that the prosecution team, not just the prosecutor, the entire— They didn't create a separate prosecution team in this case. Well, there was a prosecution team. I know, but not separate from the investigation. Right. The investigating team was the prosecution team. Correct. So they knew all the immunized testimony. No, they did not. They did not listen to the immunized statements. That's an important point. They didn't know any of it? They did not. They did not read the immunized— You may say they didn't. Is there any evidence that— There is no evidence— Wait a minute. Is that based on what a lawyer says? Yes, that is based on— Why should the court pay attention to what the lawyer says? Well, it's not just what the lawyer says. The agent testified that he did not review the Garrity statements either. No, I'm talking about the agent. Forget the agent. I'm talking about the lawyer. Yes, the lawyer did not testify in this case. And as an officer of the court, he told this court that he did not review the Garrity statements. And the agent did not— That's what the lawyer said. That is. But what the agent testified— I know that. That's what he told the court. Yes, Your Honor. But he didn't tell them under oath. No, Your Honor. Well, then why shouldn't the court have paid attention to it? The court's question was whether or not the prosecution built the case— The reason I ask is because the lawyer's representation to the court is self-interest. Your Honor, I think it's important that the agent testified under oath as to how he actually built the case. And that how he got the documents and how the prosecution team obtained— like, identified who to subpoena, what to subpoena, the documents that they got. Most of the documents that form the basis of the indictment are publicly available or they were obtained through these legitimate, untainted channels. On top of that, the government proved from 11 witnesses that their testimony was from legitimate, independent sources. So in combination, every reasonable grand juror would have returned a true bill based on the untainted evidence in this case. It's important that all of that was put forth in a Castigar hearing. And we did meet our burden of proving beyond a reasonable doubt that even if the testimony of the witnesses who did not testify— even if their testimony was tainted— any error was harmless beyond a reasonable doubt. All right. Thank you, counsel. Thank you, Your Honor. Mr. Solario, you have reserved four minutes. Thank you, Your Honor. Judge Choflat, just to your last colloquy with my friend on the other side, there was no testimony at the Castigar hearing from any of the lawyers on the prosecution team, what there were. That's my understanding. That is correct. There was nothing but representation of the court to the extent there was anything. Right, and I think, as Your Honor apprehends, the unsworn statement of a lawyer isn't evidence of anything, and that matters. I didn't mean to impugn the integrity of the lawyer. I'm just saying it's— I agree. In the nature of things, you can't accept the representation. It's just not evidence either that the government didn't violate Castigar or that the government's Castigar violation was harmless. What we do know from this record is that the prosecutor followed reporters on Twitter who reported on the JEA controversy, including based on the immunized statements. We don't know. We have no idea whether the prosecution team read these materials, and that matters. It was the government's burden here. We had widespread dissemination, starting with these— That's why you set out— That's why you tried to establish an independent prosecutor, as it were, who couldn't have— Standard practices, a taint team. The prosecutor decided not to follow that here based on his own judgment that it wasn't required. That was Special Agent Blythe's testimony. Judge Rosenbaum, I want to take a shot at trying to persuade you not to think of the property issue in terms of impossibility. Like, whether the money would exist at some point in the future is not what drives the property argument. What matters for the property argument is whether the city had a legally protected interest in that money that the law recognizes as traditional property. Let me ask you a question. I'm looking at Section 21 of the Charter, and it says, among other things, that— Okay. There is hereby created and established a body politic and corporate to be known as JEA, which is authorized to own, manage, and operate. Own, manage, and operate for the benefit of the city of Jacksonville. Blah, blah, blah. Are you looking at the Charter as it existed back in 2019? I think that's new language, if that's correct. It is, actually, from 2023. The Charter as it existed back then did not contain that language, and its validity hasn't been tested. But the point is— Well, let me ask you something. If it had contained that language, is it your position then— does that change your position? I think it would tend—not really. I mean, I don't doubt that the city has an interest in making sure that JEA provides good, cost-effective electric and sewer services to people in Jacksonville, just by the way. JEA also serves people outside Duval County. But every right that the Charter gives the city in respect of protecting that interest is regulatory. It is audit. It is—we get to review your books. We get an annual contribution instead of— Property taxes. What does it mean to own something for the benefit of the city of Jacksonville? I don't know because it wasn't the Charter provision that— the Charter provision that was applicable to us here, so we haven't really developed that in the briefs. I mean, we'd be happy to— Well, to the extent—okay, and that's fair. But to the extent that the legislative history doesn't indicate that that was a change as opposed to a clarification, how does that affect your position? I'm not sure I understand the question. Well, if the for the benefit of the city of Jacksonville language was added after 2019, then the question becomes, is that intended to be some kind of a change or is that maybe a clarification of the position that reflects what it has always been? And if it is a clarification of the position of what it's always been, then the meaning of own for the benefit of the city of Jacksonville becomes important. Well, maybe the easiest way to cut through it is this. The interpretive question doesn't matter in this case because the government never put it in front of the jury. Like, to the extent that language existed in 2019, which it didn't— It does matter, though, because I know you're encouraging me not to look at it as a matter of impossibility, but if there was enough evidence before the jury for the jury to conclude that the city would have gotten the money and it turns out that the state wouldn't be the one who would obtain the money, which is a separate question, like as a matter of fact, then I don't understand your argument. Because it seems to me your argument was, yeah, the city believed that it was going to get the money. The city believed it had a property interest, a money interest in this. And the city put evidence of that before the jury, but it doesn't really matter because the state would have gotten it. It is actually an impossibility defense, even though you're saying it's not. It's not our argument at all. Our argument is that the Wire Fraud Statute in Section 666 require proof of a traditional property interest in the victim's hands. There is no water between us and the government on that. I mean, if you look at, I think it's pages like 47 through 53 of the red brief, I mean, we're in agreement that the dispositive question here is, did the city of Jacksonville have a legal right to payment of proceeds above $3.4 billion in a sale? If yes, they win. If no— And that's why the question that I asked you, I think, is important. And the reason I think it isn't important, Your Honor, respectfully, is that the charter was never before the jury to begin with. The government did not produce that evidence— I hear you. —or any other indicia of true traditional ownership. I'm asking you, hypothetically, if we find that there was enough evidence for a jury to reasonably conclude that the city had a property interest, would have received money above and beyond the $3.4 billion number, then the question is an impossibility defense. I mean, that's what it is, because your position is it wouldn't matter. I follow. So let's just assume that. Then it's not an impossibility issue. It's a siminelli issue. It is that the government's theory here, like assume the city had some legally protected interest in the payment of money in a sale. The argument under siminelli here is all the government has charged and all it proved at trial was a deprivation of the right to control, of a right to valuable economic information about a potential disposition of JEA's assets. Recall the decision that was taken at the board meeting in July 2019 was not a decision to sell JEA. It was a decision to explore options that included a sale of JEA through a bid process. But there was also the adoption of the PUP. I mean, now we're sort of changing subjects, it feels like. But I don't think the adoption of the PUP matters, right? The money only exists if there's a sale. And the decision was not to sell. It was to explore alternatives. Multiple board members said this at the meeting. The resolution itself said anything going on is going to be subject to further action by the board. The decision it was making was an exploratory decision. And under siminelli, like that's no different than the kind of procurement rigging in siminelli where, you know, the government says, hey, you've got this thing that deprived the government of its right to know about how it might dispose of property. It's just no different here. I think siminelli is foursquare on that. Can I ask you a quick question on the property issue that we're talking about? So the government has introduced witnesses who talked about the city ownership of JEA. And your point is that's not enough for the jury to find a property interest. We have to look to the city charter, but the government failed to introduce the city charter, which answers all of these questions. So there isn't enough information for the jury to determine property interest. Is that... That is certainly part of it. I think there are aspects of what's in the charter that come in through other documents that we've cited those in the brief. Like, there was a memo by one of the OGC people explaining limitations on JEA that walks through a lot of the charter provisions. But I think you are, in essentials, right. But what I don't think, right, like, look at that testimony. I mean, look at the testimony that the government cites most. That's Paul McElroy, right. He talks about it both as being owned by the city and being owned by the public. So is your point... I just want to drill down a little bit on this. Is your point that, yes, we do have this testimony from government witnesses, but they're really... They're talking shorthand. You know, they're saying, oh, the city owns JEA. And that's shorthand, and that's a legal conclusion, and so we shouldn't... That's not enough for the jury. Absolutely correct. And it's particularly important here, right, where the legal target is title, okay. You know, most people prove title to something with a deed, with a bill of sale, some sort of trust instrument. There's nothing like that here. And the only thing that could arguably be like that would be Article 21 of the charter, and the government didn't even give them that. What difference would that make, really, that it didn't put it in? It's pure law. There's no fact in there. What the charter, what 21 does, what the whole charter does, and what 21 does, is all legal. It's like construction of a contract. I think that's correct, and in fact... I mean, that's necessarily the backdrop of the entire prosecution, is it not? I think that is true. The court could not possibly not have read the charter, the entire charter, and 21 with it, to try the case. Yeah, I don't know whether the trial court read it. Well, I mean, that's the legal frame. It's like trying a contract action, and you don't even consider the contract. I think that's correct. The government's argument, though, here, is there was enough in front of the jury for them to reach ownership. In other words... Without the charter, there wasn't. Your position is the government, in effect, said the charter is irrelevant. Yeah, they pretended it didn't exist. The charter is irrelevant. What lay people thought was the relationship between the city and the JEA. That is probative evidence, what they thought. My problem with that is, they're interpreting a contract, and they're interpreting a charter. I think you and I are on the same page. Which they cannot do. And it goes to the point that Judge Branch just made, which is, ownership is a legal conclusion derived from facts, and simply saying it's community-owned, it's city-owned, is not evidencing the legal... If A and B got into a lawsuit, and there was a contract, and without introducing it, A and B started talking about what the contract was, that was all irrelevant. That's correct. And I think the reason we have that problem here, and if there are no questions for me, I'll wrap up just on this sentence, is the way the government tried this case, they just never bothered figuring that stuff out. They went into this trial that, you know, there are going to be piles of money for the city of Jacksonville at the end of the day, and just let it go on that assumption instead of trying to prove it up. All right. Thank you very much. Thank you, Your Honor.